FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

97 OCT -8 AM II: 52

U.S. DISTRICT COURT
N.D. OF ALABAMA

GREGORY MILHOUSE,          )
                           )
     Plaintiff             )
                           )          CIVIL ACTION NO.
     vs.                   )                                    CRo
                           )          CV-96-AR-0998-S
HOOVER TOYOTA, INC. and DOBBS )
BROTHERS MANAGEMENT,       )
                           )      **ENTERED**
     Defendants            )

OCT 8 1997

## MEMORANDUM OPINION

The court has before it the motion of defendants, Hoover

Toyota, Inc. ("Hoover Toyota") and Dobbs Brothers Management

("Dobbs"), for summary judgment in the above-entitled cause.

Plaintiff, Gregory Milhouse ("Milhouse"), a former employee of

Hoover Toyota, alleges that Hoover Toyota and Dobbs violated the

Civil Rights Act of 1964, *as amended*, the Civil Rights Act of

1991, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII"), and the Civil

Rights Act of 1866, 42 U.S.C. § 1981 ("§ 1981"), by terminating

his employment as a salesperson at Hoover Toyota because of his

race, by failing to promote him to managerial positions because

of his race, and by subjecting him to hostile environment racial

harassment. Finding that no genuine issues of material fact

exist with respect to Milhouse's claims of hostile environment

racial harassment and discrimination in promotions, this court

19

determines that summary disposition under Fed.R.Civ.P. 56 is appropriate on these claims. However, the court finds the existence of a genuine issue of material fact concerning Milhouse's claim of racially discriminatory termination and, therefore, determines that summary disposition under Fed.R.Civ.P. 56 is not appropriate on this claim.

## I. Pertinent Undisputed Facts

Milhouse, a black male, began working for Hoover Toyota in August, 1986. Throughout his tenure at Hoover Toyota, Milhouse worked as a salesman of both new and used cars. (Milhouse Decl.). As a part of his responsibilities, Milhouse routinely assisted potential customers in filling out credit applications needed for car purchases. (Campbell Aff. ¶ 5).

Gary Campbell ("Campbell") served as general manager of Hoover Toyota from 1981 to 1989 and from 1993 to the present. In his position as general manager, Campbell, either alone or in conjunction with another subordinate manager, made all hiring, termination, and promotion decisions at the dealership. The dealership had no specific policy or criteria that govern the awarding of promotions. According to Campbell, he simply filled vacant management positions with the "best qualified persons."

2

(Campbell Aff. ¶ 8).  To identify the best qualified persons,

Campbell stated that he considered "prior management experience

and/or demonstrated above-average on-the-job abilities" and, to a

lesser extent, seniority.  (Id.).  In part, Milhouse contends

that there were seven management positions that became available

during his tenure at Hoover Toyota that he should have received.

(Pl. Ex. 8 Interrogatory #2).  Hoover Toyota filled each of these

positions with a white male.  (Pl. Ex. 8).

The events leading to Milhouse's termination began sometime

in January, 1995.  (Milhouse Depo. at 183).  A young, unmarried

couple, Jason Perdue and Tara Holley ("Perdue" and "Holley"),

came to Hoover Toyota intending to purchase a new truck.  Perdue

and Holley first spoke with salesperson Bubba Branning, who

referred them to Milhouse.  (Def. Ex. 11).

The dealership did not have in stock the model truck Perdue

and Holley wanted.  (Milhouse Depo. at 176).  Nevertheless, the

couple discussed financing options with Milhouse.  (Id.).  The

couple completed a credit application, and Milhouse had the

dealership's Finance Department perform a credit check on the

couple.  (Pl. Ex. 9; Milhouse Depo. at 180).  The credit report

proved unfavorable, and Milhouse informed the couple that they

did not qualify for automobile financing.  (Milhouse Depo. at

179-182).  Although the parties dispute what Milhouse actually
said to Perdue and Holly at this point, it is clear that, in some
way, he did explain that it is very difficult for two unrelated
purchasers to finance a car jointly.  Milhouse then encouraged
Perdue to enlist his father as a co-signer on the loan.  (Id. at
182).  The couple left without purchasing a vehicle.

In February, 1995, SouthTrust Bank manager David Darby
("Darby") contacted the Finance Department at Hoover Toyota.
Darby explained that one of the bank's compliance officers had
reported that Milhouse had encouraged an unmarried couple who
recently attempted to purchase a new truck to misrepresent their
familial relationship on their credit application.  Apparently,
the compliance officer who reported the incident was Perdue's
mother.

Hoover Toyota regularly uses SouthTrust Bank for automobile
financing.  In order to maintain good relations with the bank,
Campbell initiated an investigation of the incident following the
call from Darby.  He met with Perdue and Holley.  According to
statements prepared by Campbell and signed by Perdue and Holley,
Milhouse told them that "the finance company would not approve
the deal in both names unless [they] represented Ms. Holley as a
sister or relative."  (Def. Ex. 11).

4

Soon after meeting with Perdue and Holley, Campbell confronted Milhouse about the incident.  He informed Milhouse that he was accused of violating the dealership's policy against fraud.  The policy appears in the employee handbook.[1]  Also present during this meeting was finance manager, Clifford Scott, the person who had initially received the report from Darby.

At this meeting, Milhouse denied the allegations; however, it does not appear that he offered much in the way of an explanation.  (Milhouse Depo. 185).  Campbell informed Milhouse that, due to the seriousness of the allegations, he could either resign or be terminated.  (Campbell Aff. ¶ 18).  Milhouse refused to resign, and he was terminated on February 7, 1995 for what Hoover Toyota described as "misrepresentation."  (Id.; Def. Ex. 12).

## II. Analysis

### A. *Rule 56*

Rule 56 states in pertinent part:

---

[1]     In a section entitled "What We Expect of You: Dealership Policies," the employee handbook explains that "[f]alsification of any application . . . or any other document is <u>strictly</u> prohibited."  (Def. Ex. 4 at 17) (emphasis in original).  The handbook also warns that violations of the dealership policies *can* lead to termination.  (Id. at 16).  A form signed by Milhouse on August 22, 1986, indicates that he both received and read the employee handbook.  (Def. Ex. 5).

> The judgment sought shall be rendered forthwith if the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with affidavits, if any,
> show that there is no genuine issue as to any material
> fact and that the moving party is entitled to a
> judgment as a matter of law.

Fed.R.Civ.P. 56(c). The Eleventh Circuit has observed that

"[s]ummary judgment is appropriate where there exists no genuine

issue of material fact and the movant is entitled to judgment as

a matter of law." Turnes v. AmSouth Bank, N.A., 36 F.3d 1057,

1061 (11th Cir. 1994). Hoover Toyota and Dobbs have invoked Rule

56.

### B. *Dobbs's Title VII and Section 1981 Liability*

As noted above, Milhouse asserts claims against Hoover

Toyota and Dobbs. Defendants argue that Dobbs is not a proper

party to this action because it does not qualify as an "employer"

within the meaning of both Title VII and § 1981. Milhouse

concedes this point. (Pl. Brief n.1). Therefore, insofar as

this action asserts claims against Dobbs, it is due to be

dismissed.

### C. *Hoover Toyota's Title VII and Section 1981 Liability*

Milhouse contends that he experienced hostile environment

racial harassment in violation of Title VII and § 1981. (Compl.

¶ 7.) The Eleventh Circuit has explained that "[t]o succeed at

6

trial with [a] hostile environment claim [plaintiff] must
demonstrate that the actions of the defendants altered the
conditions of the workplace, creating an <u>objectively</u> abusive and
hostile atmosphere." <u>Edwards v. Wallace Community College</u>, 49
F.3d 1517, 1521 (11th Cir. 1995) (emphasis supplied).  To satisfy
this standard, plaintiff must show that "the racial slurs
allegedly spoken by co-workers [were] so 'commonplace, overt and
denigrating that they created an atmosphere charged with racial
hostility.'"  <u>Id</u>. (quoting <u>E.E.O.C. v. Beverage Canners, Inc.</u>,
897 F.2d 1067, 1068 (11th Cir. 1990).  Put another way, where
allegedly racial slurs are made "sporadically, accidentally, or
as part of casual conversation," <i>cf</i>. <u>E.E.O.C. v. Beverage
Canners, Inc.</u>, 897 F.2d 1067, 1070 (11th Cir. 1990), such
comments are not "sufficiently pervasive" to create a racially
hostile environment. <i>See</i> <u>Ellis v. Wal-Mart Stores, Inc.</u>, 952
F.Supp. 1513, 1520 (M.D.Ala. 1996).  Courts determine the
existence of a racially hostile environment by examining the
totality of the circumstances.  <u>Dudley v. Wal-Mart Stores, Inc.</u>,
931 F.Supp. 773, 791 (M.D.Ala. 1996).  The factors used in
conducting this examination include: (1) the frequency of the
discriminatory conduct; (2) the severity of the discriminatory
conduct; (3) whether the conduct was physically threatening or

humiliating, or merely offensive; and (4) whether the conduct
unreasonably interfered with the employee's work performance.
Edwards, 49 F.3d at 1521-22 (citing Harris v. Forklift Sys.,
Inc., 114 S.Ct. 367, 372 (1993).

Milhouse also contends that he experienced disparate
treatment on account of his race with respect to several
promotions and his termination in violation of Title VII and §
1981.  As an initial matter, the court notes that Milhouse's
claim of a *prima facie* case under Title VII and § 1981 is
essentially the same.  *See* Grooms v. Wiregrass Elec. Co-op.,
Inc., 883 F.Supp. 643, 647 n.3 (M.D.Ala. 1993) (explaining that
"the legal elements of a § 1981 and Title VII claim predicated on
disparate treatment are identical").  From his Brief in
Opposition to Defendants' Motion for Summary Judgment, it appears
that Milhouse intends to prove his claims of disparate treatment
by circumstantial evidence.  Using the analytical rubric of
McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817
(1973) and Texas Dept. Of Community Affairs v. Burdine, 450 U.S.
248, 101 S.Ct. 1089 (1981), Milhouse can establish his *prima
facie* case using circumstantial evidence.

In order to establish a *prima facie* case for discriminatory
termination, Milhouse must demonstrate that: (1) he is a member

8

of a protected class; (2) he was qualified for the job; (3) he was terminated despite his qualifications; and, (4) after his termination, the position remained open and the employer continued to seek applicants with similar qualifications. *See* Mayfield v. Patterson Pump Co., 101 F.3d 1371, 1375 (11th Cir. 1996). Similarly, to establish his *prima facie* case for discriminatory termination, Milhouse must demonstrate that: (1) he is a member of a protected class; (2) he was qualified for and applied for the promotion(s); (3) he was denied the promotion(s); and, (4) other equally or less qualified employers from outside the protected received the promotion(s). *See* Combs v. Plantation Patterns, 106 F.3d 1519, 1539 n.11 (11th Cir. 1997). If Milhouse establishes a *prima facie* case for his promotion and termination claims, then the burden of production shifts to Hoover Toyota to establish evidence of a legitimate, nondiscriminatory reason for fashioning the respective employment decisions that it did. *See* id. at 1528 (quoting Burdine, 101 S.Ct. at 1096). Finally, if Hoover Toyota meets this exceedingly light burden, the burden shifts to Milhouse to demonstrate that Hoover Toyota's proffered reason for each of the challenged employment decisions was a pretext and that discrimination was the genuine reason for the actions taken. *See* id.

9

Milhouse is asserting three separate claims: (1) that he was subjected to hostile environment racial harassment at Hoover Toyota; (2) that he was not promoted to managerial positions at Hoover Toyota because of his race; and (3) that he was ultimately terminated because of his race.  The court will first address Milhouse's hostile environment claim.  The court then will apply the <u>McDonnell Douglas</u> burden shifting analysis to his promotion and termination claims.

### 1. *Milhouse's Hostile Environment Claim*

In making his hostile environment claim, Milhouse recounts a number of allegedly racial incidents.  Essentially, these incidents fall into three categories: (1) those occurring in Milhouse's presence; (2) those involving Campbell; and (3) those involving other black employees.  A brief summary of the alleged incidents follows in that order.

First, Milhouse claims that several racial incidents occurred in his presence.  For example, former new car manager David Johns allegedly referred to black employees, including Milhouse, as "nigger."  Likewise, Milhouse claims that, during a tent sale, salesman Bubba Branning once said, "Dog, man, their working us like a nigger."  Milhouse also alleges that used car manager Bob Bailey once said "let's break up this meeting of the

10

NAACP" to disperse a group of black salesmen who were
congregating on the car lot.  Finally, he claims that he and
another black salesman, Jerald Porterfield ("Porterfield"), found
a piece of paper on the desk of used car manager Larry Steele on
which the word "nigger" was written.

Second, Milhouse alleges several racial incidents involving
Campbell.  Most notably, he claims that Campbell once frightened
him by throwing a rubber snake at him.  Milhouse also claims
that, on more than one occasion, Campbell told Bob Bailey that
Hoover Toyota had too many black salespersons.  In addition, he
points to an incident in which he asked about using Campbell's
fishing camp in Walker County.  Campbell allegedly responded by
saying that Milhouse shouldn't use the fishing camp because
"those white folks will hang you."

Third, Milhouse describes two racial incidents involving
other black employees at which he was not present.  He claims
that Larry Steele once allegedly used the term "nigger-rigged" in
the presence of Porterfield and Clifford Scott to describe some
repair work he had done over the weekend.  He also claims that,
in two separate incidents, Service Department employee Bruce
Kennedy was called a "nigger" and a "black crow."

Milhouse urges the court to consider all of these incidents

11

in examining the "totality of the circumstances" at Hoover

Toyota.  However, even when viewing all this evidence in the

light most favorable to Milhouse, the record reveals that the

totality of the circumstances at Hoover Toyota do not make out a

claim for hostile environment racial harassment.  Consequently,

summary judgment is appropriate on this claim for the following

reasons.

First, Milhouse fails to explain how the alleged harassment

altered the terms and conditions of his employment in any way.

In summarizing his hostile environment claim, Milhouse simply

states:

> The key factor in examining a hostile environment claim is
> the manner in which the environment affected the terms and
> conditions of employment.  Campbell disrupted Milhouse's
> work in different ways.  When Milhouse was not out on the
> lot, but instead was in the office working the phone,
> Campbell would force him to enter the lot.  Milhouse
> generated a large volume of sales from repeat business which
> he cultivated over the phone.  In another incident which
> might be described by the defendant as benign, Campbell
> tossed a rubber snake on Milhouse.  Milhouse had a great
> fear of snakes and this event greatly upset him.  Campbell
> continued to disrupt Milhouse's working environment by
> threatening other employees to stay away from Milhouse
> because he was soon to get fired.

(Pl. Brief at 19).  However, standing alone, this statement does

not show the court how the alleged harassment affected Milhouse's

employment.  For example, nothing in the record indicates that

Milhouse lost any sales when asked to work the lot instead of his

12

phone.   Likewise, Milhouse admits in his deposition that, immediately following the rubber snake incident, he completed the sale on which he was working at the time.   (Milhouse Depo. at 263).   Finally, Milhouse offers no explanation of how Campbell's warnings to other employees, if they occurred, disrupted or adversely affected his work environment.

As noted earlier, in evaluating the totality of circumstances, courts should consider the degree to which the alleged harassment unreasonably interfered with the complaining employee's work performance.   Although Milhouse may have demonstrated that he encountered some embarrassment at work, he has not shown that any disruptions, or "talk," or any of the alleged incidents, interfered with his work performance to such an unreasonable degree that they constituted hostile environment racial harassment.   The fact that Milhouse never once complained of racial harassment during his employment, and his admission that he harbors only goodwill toward Hoover Toyota clearly support this conclusion.   (Milhouse Depo. at 116, 173).

Second, the record indicates that a number of the alleged incidents of harassment were not motivated by racial animus.   For example, it is clear that the statements attributed to Bob Bailey, Bubba Banning, and Larry Steele were either accidental or

13

made as a part of casual conversation. Milhouse admitted that he laughed at Bailey's statement. (Milhouse Depo. at 74). He also testified in his deposition that he thought Banning's statement "kind of slipped out." (Id. at 248). Finally, Porterfield's deposition testimony reveals that Steele was completely unaware that he made a statement that might offend his black co-workers. (Pl. Ex. 4 at 70-71). Similarly, nothing in the record reveals that the incident involving the rubber snake was anything other than the horseplay that Milhouse alleges was commonplace at the dealership. Therefore, although the court agrees with Milhouse that these statements and practical jokes were thoughtless and unprofessional, it must also conclude that, absent evidence of racial animus, they do not constitute harassment.

Finally, the record reveals that incidents of alleged racial harassment at Hoover Toyota were sporadic at best. In order for such racial incidents to be actionable, they must occur with enough regularity to indicate the employer's approval, encouragement, or participation. See Walker v. Ford Motor Co., 684 F.2d 1355, 1359 (11th Cir. 1982) (affirming finding of hostile environment racial harassment where racial slurs were "'repeated' and 'continuous,' and 'prolonged' despite [plaintiff's] objections"). However, once one removes the four

14

incidents involving Bailey, Banning, Steele, and the rubber snake from consideration, only a handful of allegedly racial incidents, occurring between 1986 and 1995, remain. Hearsay and other evidentiary concerns aside, it is impossible for the court to conclude from these few remaining incidents that racial harassment at Hoover Toyota was so "commonplace" that it resulted in hostile environment racial harassment.

### 2. *Milhouse's Claim of Discrimination in Promotions*

Milhouse asserts that Hoover Toyota failed to consider him for seven promotions that came open during his employment because of his race. Hoover Toyota counters this assertion by arguing that Milhouse cannot make out a *prima facie* case for racial discrimination in promotions. Hoover Toyota's argument is well taken.

Milhouse fails to demonstrate that he was equally or more qualified than any of the seven men who received promotions. For example, Milhouse argues in his brief that "[h]e was equally or more qualified than at least three of those promoted before him." (Pl. Brief at 23). He then goes on to draw comparisons between his qualifications and those of Johnny Wilson, Randall Collins, and Mike Conklin. He does not, however, draw similar comparisons between his qualifications and those of the other four men who

15

received promotions.  This failure strikes the court as being an apparent concession on Milhouse's part that he cannot demonstrate that he was equally or more qualified than Steve Bailey, Larry Steele, Bobby Blair, or Mike Conklin.[2]

Moreover, the record clearly indicates that both Johnny Wilson and Randall Collins were more qualified than Milhouse. Wilson and Collins both had prior management experience, whereas Milhouse had no management experience whatsoever.[3]  Similarly, Mike Conklin had demonstrated himself to be an above-average employee, while Milhouse had not.[4]  This last fact, coupled with Milhouse's concession that management can consider factors other than experience and seniority in making promotional decisions,

---

[2]     Campbell promoted Mike Conklin twice during Milhouse's tenure at Hoover Toyota.  Apparently, Milhouse concedes that Conklin was more qualified for the second promotion — to Assistant Finance Manager in January, 1994.

[3]     Wilson worked at Hoover Toyota on two separate occasions.  During his first stint at the dealership, Wilson had worked as the assistant used car manager for one and a half years.  Collins operated his own business for five years prior to working at Hoover Toyota.  (Def. Ex. 9).

[4]     In his affidavit, Campbell describes Milhouse as an average salesperson.  (Campbell Aff. ¶ 9).  Milhouse tries to counter this statement with the deposition testimony of Bob Bailey and Jerald Porterfield.  Bailey, the dealership's former used car manager, described Milhouse as "promotable." (Pl. Ex. 6 at 59).  Porterfield testified that Milhouse was more qualified than either Conklin or Collins.  (Pl. Ex. 4 at 13-14).  However, even when considering this testimony in the light most favorable to Milhouse, it does not help him establish a *prima facie* case.  Bailey and Porterfield were not employees with decision-making authority regarding promotions.  Consequently, their opinions of Milhouse's talents relative to other employees do not create a genuine issue of material fact.

16

prevents Milhouse from demonstrating that he was equally or more qualified than Conklin. As such, Milhouse has failed to make a *prima facie* case for discrimination in promotions with respect to any of the challenged promotional decisions. This failure makes summary judgment appropriate on this claim.

### 3. *Milhouse's Discriminatory Termination Claim*

As an initial matter, the court notes that Milhouse's present evidence does not make out his *prima facie* case for discriminatory termination. However, Hoover Toyota does not contend that he is unable to do so. In light of this concession on the employer's part, the court concludes that Milhouse has met his initial burden, although defendant may be able to persuade a jury that a *prima facie* case and a case of Title VII and § 1981 liability are not the same thing.

The court also concludes that Hoover Toyota has articulated a legitimate nondiscriminatory reason for its decision to terminate Milhouse. Hoover Toyota claims it fired Milhouse for encouraging two potential customers to falsify a credit application. The employee handbook Milhouse received makes clear that the "[f]alsification of any application . . . or any other document is <u>strictly</u> prohibited" and can lead to termination. (Def. Ex. 4). Whether Milhouse actually committed the alleged

17

violation of dealership policy is irrelevant; it is enough that

the dealership believed that he did. As the Eleventh Circuit

explained in <u>Nix v. WLCY Radio/Rahall Comm.</u>, 738 F.2d 1181, 1187

(1984):

> Title VII does not take away an employer's right to
> interpret its rules as it chooses, and to make
> determinations as it sees fit under those rules. . . . Title
> VII is not a shield against harsh treatment in the
> workplace. Nor does the statute require the employer to
> have good cause for its decisions. The employer may fire an
> employee for a good reason, a bad reason, <u>a reason based on
> erroneous facts</u>, or for no reason at all, as long as its
> action is not for a discriminatory reason.

(Emphasis supplied). Having walked through the initial steps of

the <u>McDonnell Douglas</u> analysis, the court now turns to Milhouse's

main allegation — that Hoover Toyota's asserted reason for

terminating his employment is merely a pretext for race

discrimination.

The Eleventh Circuit recently explained the district courts'

role in evaluating allegations of pretext in employment

discrimination cases. In <u>Combs v. Plantation Patterns</u>, 106 F.3d

1519, 1538 (11th Cir. 1997), the court observed:

> When deciding a motion by the defendant for judgment as a
> matter of law in a discrimination case in which the
> defendant has proffered nondiscriminatory reasons for its
> actions, the district court's task is a highly focused one.
> The district court must, in view of all the evidence,
> determine whether the plaintiff cast sufficient doubt on the
> defendant's proffered nondiscriminatory reasons to permit a
> reasonable factfinder to conclude that the employer's

"legitimate reasons were not what actually motivated its
conduct." (Citation omitted). <u>The district court must
evaluate whether the plaintiff has demonstrated "such
weaknesses, implausibilities, inconsistencies,
incoherencies, or contradictions in the employer's proffered
legitimate reasons for its action that a reasonable
factfinder could find them unworthy of credence."</u>
(Citations omitted). However, once the district court
determines that a reasonable jury could conclude that the
employer's proffered reasons were not the real reason for
its decision, the court may not preempt the jury's role of
determining whether to draw an inference of intentional
discrimination form the plaintiff's prima facie case taken
together with rejection of the employer's explanations for
its action. <u>At that point, judgment as a matter of law is
unavailable</u>.

(Emphasis supplied). When this standard is applied in the

instant case, it becomes clear that summary judgment is not

appropriate on the termination claim.

Milhouse points to two incidents in the record that lead the

court to this conclusion. First, salesman Homer Crandall

testified in his deposition that he overheard Campbell say "I've

got some niggers to get rid of and some drug-heads." (Def. Ex.

7 at 16-17). This incident allegedly occurred very shortly after

Campbell returned to the dealership as general manager in 1993.

(Id.). Second, salesman Jerald Porterfield testified in his

deposition that Campbell came to him approximately two months

prior to Milhouse's termination and said "there's been some

problems with [Milhouse], and, as soon as I can, I'm going to run

him off, and I don't want you to be a part of that." (Pl. Ex. 4

19

at 82-83). Taken together, these statements, if they were made, suggest that Campbell wanted to fire black employees in general and Milhouse in particular. Moreover, given that the alleged statement to Porterfield occurred one month <u>prior</u> to the alleged incident involving Perdue and Holley, it suggests that something other than the encounter with the young couple motivated Campbell's decision to fire Milhouse. In short, if Campbell made the alleged statements, then they suggest that he fired Milhouse because he was black and not because he violated dealership policy. As such, these statements provide a basis from which a reasonable factfinder could conclude that Hoover Toyota's articulated reason for its decision to terminate Milhouse is unworthy of belief. Therefore, as per the <u>Combs</u> decision, summary judgment is not an option.

### III. *Conclusion*

The court will enter a separate and appropriate order reflecting the conclusions reached in this memorandum opinion.

DONE this ___8___ day of October, 1997.

WILLIAM M. ACKER, JR.
UNITED STATES DISTRICT JUDGE

20